# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JENNIFER COATS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16-CV-233-TCK-JFJ |
| RELIANCE STANDARD LIFE INSURANCE COMPANY, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court are (1) Plaintiff's Motion for Judgment on the Administrative Record (Doc. 28); (2) Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion (Doc. 31); and (3) Plaintiff's Response to Defendant's Cross-Motion for Judgment on the Administrative Record and Reply to Defendant's Response to Plaintiff's Cross Motion for Judgment. (Doc. 32).

**I. Background**

The facts of this case are largely undisputed. On April 2, 2012, Plaintiff Jennifer Coats was hired as a staff nurse with Cottage Health Care ("Cottage"), and became a participant in Cottage's employee welfare benefit plan (the "Plan"), which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan includes long-term disability ("LTD") benefits funded by Defendant Reliance Standard Life Insurance Company ("Reliance") through Group Policy No. LSC 97, 200. The Plan provides that Reliance "shall serve as the claims review fiduciary with respect to the insurance policy and the Plan"; shall "determine eligibility for benefits"; and shall make "complete, final and binding decisions on all parties." (AR 18.)

The Plan policy provides:

MONTHLY BENEFIT: The Monthly Benefit is an amount equal to:

CLASS 1:

> CORE: 50% of Covered Monthly earnings, payable in accordance with the section entitled Benefit Amount.
> BUY-UP: 60% of Covered Monthly earnings, payable in accordance with the section entitled Benefit Amount.

AR 9.

> ELIGIBLE CLASSES: each employee of Cottage Health system . . . . according to the following classifications:
>
> > CLASS 1: active, Full-time and **Part-time employees** except an employee included in any other class and a Traveling Nurse.
> >
> > CLASS 2: active, Full-time Director or above employee
> >
> > CLASS 1: "Part-time" means working for you for a minimum of 18 hours during a person's **regular work week**, or a minimum of 36 hours bi-weekly but less than 72 hours bi-weekly.

*Ibid* (emphasis added). The Plan Policy contains the following pertinent definitions:

DEFINITIONS

> CLASS 1: "Covered Monthly Earnings" means the Insured's monthly salary received from you on the first of the Policy month just before the date of Total disability. **Covered Monthly earnings does not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly earnings.**
>
> If hourly paid employees are insured, the number of hours worked during a **regular work week**, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings.

AR 12 (emphasis added). The term "regular work week" is not defined.

Reliance uses a standardized form titled "Integrated Disability Benefit Initial Statement of Claim, RS-1971-A," to initiate and process disability claims. AR 195-201. RSL claims personnel

refer to it as the "EE App." *See* AR 122. Submission of a completed EE App formally initiates a disability claim. The EE App has five sections, some to be completed by the employee, some by the employer and some by a treating physician. AR 195-201.

On October 19, 2013, Plaintiff suffered an on-the-job back injury, and she has not worked for Cottage since then. Reliance fixed that date as the "date of loss" ("DOL"). AR122. On March 24, 2015, Plaintiff submitted to Reliance an EE App for long term disability ("LTD") benefits. AR 195-201, *supra*.

Three text fields in the EE App, as completed by Cottage, are pertinent to this dispute. The first asks the method of Claimant's' compensation. Cottage stated that Plaintiff was "Hourly." AR197. The second requires the employer to state "Weekly earnings *(as defined in policy)*" (emphasis in original). *Id.* Cottage inserted the figure "1,287.49." *Id.* The third asks for "Work schedule at time of disability ___ day/week ____ hrs/day. Cottage indicated that Plaintiff worked 2 days a week for 12 hours a day." *Id.*

On May 5, 2015, RSL's claims examiner, Spencer Wright, requested that Cottage provide "payroll for the period of 07/01/2013 – 01/15/2014 and timecards for the period of 10/01/2013-01/15/2014." AR 308. Cottage supplied these records. AR 311-347. On May 21, 2015, Wright made an extended entry into the claim log, in which he concluded, based on Plaintiff's payroll records and timecards, that she averaged 23.70 hours of work per week in the last 12 weeks (three

months) before she became disabled (July 22, 2013-October 13, 2013),[1] and was therefore eligible for benefits. AR 122.[2]

On June 4, 2015, Wright sent an email to Kreuger, asking six questions. On June 5, 2015, Kreuger responded to the questions, as follows:

a. Is Ms. Coats an hourly or salaried employee? *Hourly*

b. If hourly, please provide rate per hour on 10/01/13. *$52.7361 hourly, plus a separate night shift differential rate of $5.00 hourly for hours worked between 1900 (7:00 pm) – 0700 (7:00 am)*

c. Regularly scheduled number of hours required to work weekly? *24 hours weekly*

d. How many hours per day? *Twelve (12).* How many days a week? *Two (2) twelve (12) hour shifts.*

e. Is Ms. Coats eligible to receive commissions, overtime pay, bonuses or any other special compensation? *Commissions-no, overtime-yes, bonuses-yes, or other special compensation-yes.*

f. If so, are those amounts provided on the claimant's payroll records? *Yes.*

AR 88; 402; 405-412.

On June 5, 2015, Wright recalculated the hours, using the time period of September 2-30, 2013 (four weeks), and concluded that Plaintiff worked an average of only 16.83 hours per pay period and was therefore ineligible for benefits. AR 127-28. A letter denying Plaintiff's claim was dispatched that day. AR 150-153. Cottage and Plaintiff appear to have been immediately informed

---

[1] The actual entry for the first pay period, July 22, 2013 to August 4, 2013, incorrectly states "08/22/2013-08/04/2013 paid on 8/09/2013…" AR 122.
[2] The Court notes that the 23.70 hours figure for actual hours worked is very close to the scheduled figure of 24 hours a week.

4

of the denial, as the same day, Ms. Johnson sent an e-mail to Wright and his supervisor, Heather Johns, asking for clarification about why the claim was denied. AR 131.

On June 10, 2015, Wright calculated the hours again, using the time period of July 22, 2013,[3] to October 18, 2013 (12 weeks), and concluded Plaintiff had worked an average of only 19.21 hours during that time period, but "was an eligible employee immediately prior to leaving work," and was therefore eligible for benefits. AR 131-132.[4]

In calculating Plaintiff's LTD benefits, Reliance designated the hourly average from the August 9, 2013-October 18, 2013 period (19.21 hours) as the basis for awarding benefits, rather than the hourly average from the August 22, 2013-October 13, 2013 period (23.70 hours). Moreover, Reliance excluded the shift differential plaintiff received for working hours between 7 p.m. and 7 a.m..

By letter dated June 11, 2015, Reliance approved the claim and granted Plaintiff $2,194.96 in monthly LTD benefits. Believing the award was insufficient, Plaintiff filed an administrative appeal of the benefit determination on December 3, 2015. (AR 187). The appeal was denied on April 20, 2016. (AR 189-194). After the denial of her administrative appeal, Plaintiff filed suit against Reliance in Tulsa County, Oklahoma District Court on April 5, 2016. (Doc. 2-2). On April 27, 2016, Reliance removed the case to this court on the basis of 28 U.S.C. §§1331, 1441(a), (b) and (c) and 29 U.S.C. §1132(e). *Id.*

---

[3] Wright incorrectly dated the first two-week pay period as "8/22/2013-8/04/2013" instead of "7/22/2013-8/04/2013." AR 132.

[4] Wright noted that Plaintiff worked 53.25 hours during the pay period of September 16, 2013-September 29, 2013 and 59.50 hours during the pay period of September 30, 2013-October 13, 2013, and stated, "EE was not averaging full-time hours prior to leaving work, however was an eligible employee immediately prior to leaving work, therefore appears to be eligible for benefits." AR 132-133.

## II. Standard of Review

The Court previously entered partial summary judgment holding that a *de novo* standard of review is applicable in this case due to the untimeliness of Reliance's review of Plaintiff's appeal. (Doc. 23).

When performing a *de novo* review, the Court "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews and medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *McDonnell v. First Unum Life Ins. Co.*, 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013) (internal citations omitted).

Additionally, "'[i]nsurance contracts, because of the inequality of the bargaining position of the parties, are construed strictly against the insurer," and "[t]hese rules of construction apply equally to ERISA cases governed by federal common law." *Kellogg v. Met. Life Ins. Co.*, 549 F.3d 818, 830 (2008) (citations omitted). Likewise, the doctrine of *contra proferentum*, which requires the Court to construe all ambiguities against the drafter, is applicable. *Id.*

Finally, under Oklahoma law, when policy language is susceptible to two different but reasonable interpretations, it is the expectations of the insured that control. *Western World Insurance Co. v. Merkel*, 677 F.3d 1266, 1275 (10th Cir. 2012).

## III. Analysis

The gravamen of this dispute is the meaning and relationship of several terms in the policy, most importantly "Covered Monthly Earnings," "regular work week," "regular weekly earnings," and "rate per hour."

The Plan defines "Covered Monthly Earnings" as:

…the Insured's monthly salary received from [Cottage Health Systems] on the first of the Policy month just before the date of Total Disability. Covered Monthly Earnings does not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings.[5]

*If hourly paid employees are insured, the number of hours worked during a regular work week, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings.* If an employee is paid on an annual basis, then the Covered Monthly Earnings will be determined by dividing the basic annual salary by 12.

(AR12) (emphasis added). "Regular work week," "regular weekly earnings," and "rate per hour" are not defined.

Nevertheless, Reliance contends that although Plaintiff worked a different number of hours in each of the weeks leading up to the date of disability, the "regular work week" is the average of the hours worked in each of the weeks for the time period of July 22, 2013, to October 13, 2013 (12 weeks)—19.21 hours. Doc. 31 at 10 (citing AR 192). Further, it argues that Plaintiff's Covered Monthly Earnings ("CME") must be calculated by multiplying 19.21 hours by $52.24— Plaintiff's regular rate of pay excluding the night shift differential. Doc. 31 at 10.

These two determinations—that the average number of hours worked per week was 19.21, and that the hourly rate was $52.24, form the basis for Plaintiff's appeal. Plaintiff argues that the term "Covered Monthly Earnings" is ambiguous when applied to hourly workers because the term "Regular Work Week," when applied to hourly employees, is ambiguous. She asserts that construing the term in the manner most favorable to her, the hourly work week for her was the

---

[5] The Court notes that the last sentence of this definition is hardly a model of clarity, as it excludes from "*covered monthly earnings*" "…any other special compensation not received as *Covered Monthly Earnings*." (AR12).

7

scheduled work week of 24 hours. Further, she contends that the shift differential was part of her regular pay and not subject to exclusion.

### A. "Regular Work Week"

Reliance concedes that the phrase "regular work week" is not defined in the Plan, but asserts that for hourly employees, the only reasonable interpretation is that a "regular work week" should be determined based on the payroll records which document bi-weekly compensation and the time cards which were completed weekly. (Doc. 31 at 9-10) (citing AR 150-347). Plaintiff, in contrast, argues that the phrase "regular work week" means the number of hours the insured employees is ordinarily scheduled to work, which in this case is 24.

To determine whether a phrase is ambiguous under the circumstances, courts "consider the common and ordinary meaning of the word, as a reasonable person in the position of the participant would understand it." *LaAsmar*, 605 F.3d at 804. "In that light, a term is ambiguous if it 'is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term.'" *Id.* (quotation omitted).

As previously stated, Reliance takes the position in this case that the proper way to determine the Plaintiff's "regular work week" is to total the hours she actually worked during the 12 weeks preceding the onset of disability (excluding vacation, overtime pay bonuses or any special compensation) and divide it by twelve. Doc. 31 at 10. However, In *Campos v. Reliance Standard Life Ins. Co.*, 2017 WL 11370691 at *3 (C.D. Cal.), Reliance took the position that the correct approach to determining the insured's eligibility for LTD benefits was to examine payroll records and determine whether, over the 16-week period immediately preceding her disability,

Campos had worked the minimum requirement of 30 hours each and every week. It argued that since she had not, she was not eligible for LTD benefits. The court disagreed, stating:

> Despite Reliance's argument to the contrary, there is ambiguity in how to determine a "regular work week" under the LTD Plan. The LTD Plan terms do not expressly define what constitutes a "regular work week." Moreover, the dictionary definition of the word "regular" is of no help in determining a method of calculating a regular work week. *See Regular*, Merriam-Webster's Dictionary, https://www.merriam webster.com/dictionary/regular (last visited April 10, 2017) (defining "regular" in part as "recurring, attending, or functioning at fixed, uniform, or normal intervals"). Reliance's decision to look at the preceding eight pay periods to determine Plaintiff's "Regular work week" is, at best, *only one of several permissible ways to determine a "regular work week."*

*Id.* The *Campos* court concluded that it would consider Plaintiff to have met the full-time requirement if she can provide a reasonable calculation method establishing that she worked in excess of 30 hours in any "regular work week" prior to her injury. *Id.*

Here, too, the term "regular work week" is ambiguous. Therefore, the Court must determine whether Plaintiff has offered a reasonable interpretation of the term. Plaintiff proposes two alternative methods of determining the appropriate monthly benefit amount:

a. Multiply Plaintiff's *regularly scheduled* number of hours per week (24, as reported by the employer on the EE App), times the hourly rate of pay that Plaintiff contends should apply ($57.74), to yield "regular weekly earnings" of $1,385.76. (emphasis added). That result would be multiplied by 4.333 to reach a CME of $6,004.50, which, when multiplied by fifty percent yields a gross monthly benefit of $3,002.25.

b. Alternatively, take the "weekly earnings" figure of $1,287.49 from Plaintiff's EE App, multiplied by 4.333, to reach a CME of $5,578.69. Plaintiff's gross monthly benefit would be fifty percent of the resulting number, or $2,789.35.

Doc. 32 at 9-10. Applying the doctrine of *contra preferentum*, the Court concludes that the term "regular work week" should be construed to mean the number of hours regularly scheduled in a

week—in this case, 24 hours—and the Plaintiff's benefit should be calculated by multiplying her regularly scheduled number of hours by the hourly pay rate.[6]

### B. Hourly Rate of Pay

Plaintiff also challenges Reliance's exclusion of the $5.00 per hour shift differential she received for hours worked from 7:00 p.m. to 7:00 a.m. Reliance argues such pay is excluded by the definition of "Covered Monthly Earnings," which states:

> "Covered Monthly Earnings" means the Insured's monthly salary received from [Cottage Health Systems] on the first of the Policy month just before the date of Total Disability. *Covered Monthly Earnings does not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings.*

AR 12, *supra.* However, the circularity of the second sentence renders the definition of "Covered Monthly Earnings" ambiguous as to what "special compensation" is excluded.

Cottage's Overtime, Double-time, and Premium Pay Policy provides that the employer will:

1. pay nonexempt employees overtime and double-time in compliance with California law;
2. pay additional premium pay beyond that which is legally required for certain categories of work; and
3. communicate to employees the methods by which overtime, double-time and premium pay are calculated.

AR408. The policy states that nonexempt employees are "paid on an hourly basis and are eligible for overtime, double-time and premium pay." AR0408. It describes the "Base Rate of Pay" and the "Regular Rate of Pay," as follows:

> **Base Rate of Pay:** Every nonexempt employee has a *base rate of pay*, which is the gross amount paid to the employee for one hour of work that does not qualify as

---

[6] This approach also seems appropriate in light of Reliance's request that the employer provide Plaintiff's regularly scheduled hours per week.

10

overtime or double-time, without regard to any additional elements of the employee's earnings, such as shift differentials.

* * *

**Regular Rate of Pay:** If an employee's straight time earnings for a given pay period are based entirely on the base rate of pay, the employee's base rate of pay will equal the employee's regular rate of pay. However, if the employee received other <u>includable compensation</u> during a pay period (such as shift differential), the employee's regular rate of pay will be greater than the employee's base rate of pay.

AR409-409 (emphasis in original). The policy explicitly states that shift differentials are considered to be "includable compensation."[7] Accordingly, pursuant to the employer's own policies, payment for shift differentials is part of the employee's "regular rate of pay." Moreover, Krueger's response to Wright's June 2, 2015, inquiry clearly stated that Plaintiff's hourly rate was "$52.7361 hourly, plus a separate night shift differential rate of $5.00 hourly for hours worked between 1900 (7:00 pm) – 0700 (7.00 am)."[8] AR 402.

Focusing on the employer's definitions of "includable compensation," "regular rate of pay," and "base rate of pay," the Court concludes that the $5.00 per hour night shift differential was part of her "Covered Monthly Earnings" under the insurance policy. *See Perugini-Christen v. Homestead Mortgage Co.*, 287 F.3d 624, 627 (7th Cir. 2002) (holding that district court correctly looked to the employer bank's characterization of branch profits in determining whether such profits were part of covered monthly earnings).

---

[7] Preceptor pay, charge relief pay, standby pay, Staffing Contingency Plan pay, reporting time pay, minimum call-back guarantee and "Other includable compensation as required by law," are also listed as "includable compensation." AR0409.
[8] Notably absent from Krueger's description of Plaintiff's compensation were the terms "overtime" and "double-time." AR 402.

11

**IV.     Conclusion**

Applying, as it must, a *de novo* standard of review, the Court grants Plaintiff Jennifer Coats' Motion for Judgment on the Administrative Record (Doc. 28) and denies Defendant Reliance Standard Life Insurance Company's Cross-Motion for Judgment on the Record (Doc. 31).

ENTERED THIS 11th day of June, 2019.

TERENCE C. KERN
United States District Judge